IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 17, 2003

**STATE OF TENNESSEE v. TERRY TARRANT**

**Direct Appeal from the Circuit Court for Franklin County**
**No. 13903      Buddy D. Perry, Judge**

---

**No. M2002-01805-CCA-R3-CD - Filed July 24, 2003**

---

The Franklin County Grand Jury indicted the Defendant and Susan Davis, the co-defendant, for one count of aggravated robbery and for one count of theft of property valued between five hundred and one thousand dollars.  A jury convicted the Defendant and co-defendant on both counts.  The Defendant now appeals, contesting the sufficiency of the State's evidence.  Specifically, the Defendant contends that the State did not introduce sufficient evidence for a rational jury to find beyond a reasonable doubt that the Defendant entered the home of the alleged victims.  Finding no error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JERRY L. SMITH and JOHN EVERETT WILLIAMS, JJ., joined.

David O. McGovern, Assistant Public Defender, Jasper, Tennessee, for the appellant, Terry Tarrant.

Paul G. Summers, Attorney General and Reporter; Braden H. Boucek, Assistant Attorney General; J. Michael Taylor, District Attorney General; and Steven M. Blount, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

I.  FACTS

James Clark testified that he and his wife, Frieda, stayed with the Defendant, Clark's lifelong friend, on the night of February 2, 2001, because the heater was broken at the Clarks' home.  Clark stated that the Defendant invited the Clarks to spend the night at his home where the heater was working.  He testified that the Clarks drove their own car to the Defendant's home. Clark recounted the events of that night, stating that around 5:00 p.m., he and his wife arrived at the Defendant's home, where the Defendant, Ms. Davis, and Ms. Brown were sitting around, drinking beer, and

watching television. Clark stated that he had not seen the co-defendant, Ms. Davis, before that night at the Defendant's house and only knew Ms. Brown through her father. He testified that he had consumed three or four beers before arriving at the Defendant's home and continued to drink beer after he arrived. He testified that when he went to bed, he had consumed six or eight beers, "maybe a little more." Clark said that he saw no one leave the house after he and his wife joined the group. However, he also stated that sometime before midnight, he and his wife were the first of the group to go to bed. Clark testified that he and his wife slept in the Defendant's bed in the bedroom while the others stayed out in the living room. He did not recall being awakened from his sleep that night.

Clark testified that the Defendant and Ms. Davis were at the house when the Clarks awoke, but that they were leaving to go "do some barbering." Clark stated that he and Mrs. Clark did not stay at the Defendant's home for very long and left for their own home around 7:30 or 8:00 a.m. Clark explained that when he and Mrs. Clark returned to their home, Mrs. Clark noticed that their eleven-year-old son's Play Station was missing. He testified that he did not find any evidence that somebody had broken in, but that the house might have been left unlocked since his mother lived next door. Clark stated that he and Mrs. Clark lived in a trailer next to his mother's home in Franklin County.

Clark stated that his wife spoke to the sheriff's deputy, Mr. Dyer, and reported the Play Station, a boom box, and Play Station games missing. He stated that he later learned that his son had twenty-two games. Clark testified that had he sold the Play Station unit, the games, and the stereo some time before they were stolen, he would have accepted six or seven hundred dollars in exchange for the items. Clark testified that, on the suggestion of his nephew, he and his wife went to P & B pawn shop to look for the stolen items. He stated that he spoke to Ms. Grubbs, the lady who was running the place, and told her why he was there. He stated that Grubbs took the Clarks into the back room of the store and showed them the items that the Clarks had described to her as missing: the Play Station unit, the twenty-two games, and the boom box. Clark stated that no one had permission to enter his home while he was at the Defendant's house.

Freida Clark testified that she had known the Defendant as long as she had been married to Mr. Clark. Mrs. Clark testified that the Defendant had been in her home at least thirty times, but never without Mr. or Mrs. Clark present. She also testified that the Defendant had problems walking and therefore used a cane. Mrs. Clark stated that she did not believe, and did not want to believe, that the Defendant stole her son's things.

Mrs. Clark testified that she knew Ms. Davis from when they were in jail together about two or three months before this incident. Mrs. Clark stated that she was in jail at that time for public drunkenness. She later agreed when the defense attorney suggested that Mrs. Clark had been in jail with Ms. Davis in 1997 rather than a couple of months before this incident. She stated that Ms. Davis had also been to her home once or twice after being released from jail. She later stated that Ms. Davis had visited her home "two or three times . . . every once in a while" to sit around, watch TV, drink beer, and "talk about the good old times." Mrs. Clark testified that she did not remember

the dates very well, but she thought she bought the Play Station for her son for Christmas in 1999. Mrs. Clark stated that she was confused about whether Ms. Davis was in the Clarks' home when they had a Play Station, but Mrs. Clark testified that she assumed that Ms. Davis knew it was there.

Mrs. Clark testified that the Clarks' heat and electricity stopped working on February 2, 2001, so the Clarks drove to the Defendant's home, where they spent the night. She stated that the Defendant, Ms. Davis, and Ms. Brown were at the Defendant's home when the Clarks arrived. She recalled sitting around and drinking a few beers that night before going to bed around midnight. She stated that she drank three beers at the Defendant's house and no beers before she arrived.

Mrs. Clark stated that when she and Mr. Clark retired for bed, the Defendant, Ms. Davis, and Ms. Brown were still awake and in the house. She testified that she and Mr. Clark went to bed in the Defendant's bedroom, which was located near the front door. Mrs. Clark also stated that the bedroom did not have a door, but did have a curtain in the door frame. She testified that she did not hear anyone leave the house that night. Mrs. Clark also testified that when she went to bed, she was "pretty well out" and slept soundly. She recalled waking up "pretty early" the next morning, sometime between 7:00 and 9:00 a.m. Mrs. Clark testified that when she awoke, the Defendant and Ms. Davis were not at the house because they had gone to "do some hair cutting." When pressed for clarification, Mrs. Clark testified that the Defendant and Ms. Davis were at the house when she awoke but that they left before the Clarks did.

Mrs. Clark testified that on the way home, she noticed that her child support check was missing from her purse and became worried that something was wrong at her house. She stated that when the Clarks returned to their home, she discovered that her son's Play Station and his twenty-two Play Station games were missing. She testified that these items were in the house before she went to the Defendant's house to spend the night. Mrs. Clark stated that she called the police about the missing items from the phone in her mother-in-law's house next door. She testified that a policeman, Mr. Dyer, came out to her residence and helped her make a report. Mrs. Clark testified that she and her husband also went looking for the stolen items at P & B pawn shop independently of the police. She stated that she spoke to Ms. Grubbs, a pawn shop employee, who showed the Clarks items that they identified as their son's Play Station, games, and boom box. Mrs. Clark testified that she had not given anyone permission to pawn her son's items and specifically stated that she did not give the Defendant or co-defendant, Ms. Davis, permission to pawn the items.

Mrs. Clark stated that the Clarks sometimes left the doors of their trailer unlocked because they lived right next door to Mr. Clark's mother. She also testified that her mother-in-law could see what was going on at the trailer from her own home. Mrs. Clark stated that her mother-in-law saw Ms. Davis driving the Defendant's car into the Clarks' driveway the night before they discovered that the Play Station unit, Play Station games, and boom box were missing. Mrs. Clark conceded that she did not discuss what her mother-in-law told her with the district attorney or her husband. Mrs. Clark testified that she had been in a car wreck and had "brain problems" that caused her to have trouble with her memory.

-3-

Jennifer Grubbs, an employee of P & B pawn shop and the Franklin County Sheriff's Department, testified that she had worked for the pawn shop for about two years and was working there on February 3, 2001. Ms. Grubbs described her duties as running the store when she is there, taking pawns when people pawn items, allowing people to buy back their pawned items, and also running retail of items that were not taken out of pawn. She testified that she opened P & B Pawn at 8:00 a.m. on February 3, 2001. Ms. Grubbs stated that she knew the Defendant and Ms. Davis by sight prior to that day. She testified that the Defendant and Ms. Davis arrived at the store in a large car driven by the Defendant. She stated that the Defendant and Ms. Davis brought items into the store that morning. Referencing the pawn ticket from that day, Ms. Grubbs testified that the Defendant and Ms. Davis sold a Sanyo boom box, a Play Station unit, and twenty-two Play Station games to the pawn shop for ninety-six dollars at 8:32 a.m. Ms. Grubbs identified pictures of the Play Station unit, a bag of games, and a Sanyo boom box as the items or as items similar to those that the Defendant and Ms. Davis pawned that day.

Ms. Grubbs recalled the events of the morning: "They were my first customers of the day. Mr. Tarrant walked around the store. When he made eye contact with me he went back out to his car and that's where he stayed. Ms. Davis is the one who did the pawn transaction." She did not recall whether the Defendant walked in using a cane or a walker or if he was carrying any items. She stated that she saw Ms. Davis's driver's license, wrote the driver's license number on the pawn ticket, and had Ms. Davis sign her name on the pawn ticket as well. She remembered that Ms. Davis seemed "extremely nervous and acted like something was wrong with her." Ms. Grubbs also testified that the Clarks came to her store later that day asking about the aforementioned items. She stated that in her presence the Clarks identified the items as their belongings. She stated that Officer Bell with the sheriff's department became involved in the case and took the items from the pawn shop.

Michael Bell, an investigator for the Franklin County Sheriff's Department, testified that he investigated this case on February 3, 2001. He stated that he spoke with Mrs. Clark and someone from P & B pawn shop during the course of his investigation. He testified that he never went to the Clarks' trailer or investigated how someone had gotten into the trailer. Bell also testified that he retrieved the boom box, the Play Station, and twenty-two Play Station games from the pawn shop; photographed the items; and then returned the items to the Clarks. He identified the photographs that he took of the items. He stated that he did not perform fingerprint tests because doing so might have ruined the electronic equipment and because he did not think that the tests were necessary in this case since he had the statements regarding the Defendant and Ms. Davis bringing the items into the pawn shop soon after they were stolen.

Sheylon "Cody" Brown testified that she was at the Defendant's home on the night of February 2, 2001 in the company of Mr. and Mrs. Clark, the Defendant, and Ms. Davis. Brown stated that the group sat around watching TV, drinking beer, and talking. She stated that the Clarks arrived around "dusty dark." She testified that Ms. Davis borrowed the Defendant's car to go to her mother's house and did not return while Brown was there. Brown also testified that the Clarks did not go to bed while she was at the Defendant's house. Brown stated that she left around 3:00 a.m.

when her boyfriend picked her up to go to Atlanta. She estimated that she drank probably twelve beers, but was not very drunk because she had a high tolerance to alcohol. Brown denied that she was an alcoholic. She stated that Mrs. Clark drank enough that night to become so tipsy that she fell over and broke a toilet. She testified that all five people in the group were drinking out of a case of beer.

## II. ANALYSIS

The Defendant contends that the State did not present sufficient evidence to prove an element of burglary, specifically that the Defendant entered the home of the alleged victims, the Clarks. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.

To prove aggravated burglary, the State must convince the trier of fact beyond a reasonable doubt that a defendant (1) entered a habitation, (2) without effective consent of the property owner, and (3) committed or attempted to commit a felony, theft, or assault in the building. Tenn. Code Ann. §§ 39-14-402(a)(3), -403(a). For the purposes of aggravated burglary, "habitation" means "any structure, including buildings, module units, mobile homes, trailers, and tents, which is designed or adapted for the overnight accommodation of persons." Id. § 39-14-401(1)(A). The Code defines "enter" for the purposes of burglary as an "[i]ntrusion of any part of the body," id. § 39-14-402(b)(1) or "[i]ntrusion of any object in physical contact with the body or any object controlled by remote control, electronic or otherwise." Id. § 39-14-402(b)(2). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Id. § 39-14-103. In order to convict a defendant

of burglary, the State is not required to offer a witness who saw the defendant break and enter the burglarized premises. Ramsey v. State, 571 S.W.2d 822, 824 (Tenn. 1978).

"A person is criminally responsible for an offense committed by the conduct of another if . . . [a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense . . . ." Tenn. Code Ann. § 39-11-402(2). "Each party to an offense may be charged with commission of the offense." Id. § 39-11-401(b).

The State presented the following testimony at the trial. Mrs. Clark testified that the Defendant and the co-defendant were familiar with the Clarks' residence and that both had visited it prior to this incident. She stated that the Defendant had been there at least thirty times before. Mr. Clark testified that the Defendant had never been to the Clark home without Mr. or Mrs. Clark present. Mr. and Mrs. Clark testified that the Defendant invited them to stay in his home overnight since they did not have any heat in their own home. The Clarks stated that Ms. Davis and Ms. Brown were at the Defendant's home that night as well. They both claimed that they went to bed in the bedroom around or before midnight while the rest of the group was still awake in the living room. Mrs. Clark stated that her mother-in-law, who lived next door to the Clarks, told her that she saw the Defendant's car in the Clarks' driveway that night. Mr. Clark testified that they drove their own car to the Defendant's house.

The Clarks stated that their home was robbed during the night while they were at the Defendant's home. They claimed that a boom box, a Play Station unit, and twenty-two Play Station games that were present at their residence before they went to the Defendant's home were missing the next morning when they returned to their own home. The Clarks recalled filing a report with the police that morning. A pawn shop employee, Ms. Grubbs, testified that she saw the Defendant and Ms. Davis come into the store together the next morning with items later identified as those stolen from the Clarks' home. She said that the Defendant walked in, made eye contact with her, and then walked out to wait in the car. She also said that co-defendant was acting nervous as she pawned the items. Ms. Grubbs testified that she gave the co-defendant ninety-six dollars in exchange for the pawned items. She stated that the Clarks came in later that day and identified the items pawned by the co-defendant as the boom box, Play Station, and Play Station games that were missing from their home. Officer Bell with the sheriff's department testified that he photographed the items, determined that they were the items that Mrs. Clark reported missing, and eventually returned them to the Clarks.

The strongest legitimate view of the foregoing facts which is most favorable to the State is that the Defendant lured the Clarks away from their own home and invited them to sleep in his bedroom where they would not be aware of his activities. Then, the Defendant left his house, possibly accompanied by Ms. Davis, and went to the Clarks' home where he entered their home without the Clarks' permission in order to remove the Play Station unit, games, and boom box. The next morning, the Defendant pawned the items in exchange for ninety-six dollars.

From the Clarks' testimony that the items were previously in the their home and from Ms. Grubbs' testimony that the Defendant and Ms. Davis brought the items to the pawn shop the next morning, the jury could reasonably infer that either the Defendant or Ms. Davis entered the Clarks' home. As the Defendant notes, the evidence does not exclude the possibility that Ms. Davis entered the Clarks' home and removed the items rather than the Defendant. However, the jury was not required to make an inference that the Defendant himself entered the home in order to find him guilty of aggravated burglary because the trial court properly instructed the jury to consider the principles of criminal responsibility. Once the jury found that all of the elements of aggravated burglary had been committed by either the Defendant or Ms. Davis, the co-defendant, then the jury could reasonably convict both the Defendant and Ms. Davis as criminally responsible for each other's acts.

The State's evidence was sufficient for a rational jury to conclude that either the Defendant or Ms. Davis, the co-defendant, or both, actually entered the victims' home without the victims' consent and with the purpose of committing theft therein. Therefore, the State presented sufficient evidence for a jury, by applying the principles of criminal responsibility, to find the Defendant guilty of aggravated burglary and theft.

For the foregoing reasons, we AFFIRM the judgments of the trial court.

_____

ROBERT W. WEDEMEYER, JUDGE